105 F.3d 660
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
FREEMAN UNITED COAL MINING CO., Petitioner,
v.
Dick HUDSON, Benefits Review Board, and Director, Office of
Worker Compensation Programs, United States
Department of Labor, Respondents.
 No. 96-2289.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 17, 1996.
Decided Jan. 3, 1997.
 
 Petition for Review of a Decision and Order of the Benefits Review Board, United States Department of Labor, BRB No. 95-1508.
 Ben.Rev.Bd.
 AFFIRMED.
 Before COFFEY, FLAUM, and EVANS, Circuit Judges.
 
 ORDER
 
 1
 This case is here on a petition by the Freeman United Coal Mining Company to review a decision and order of the Benefits Review Board (BRB) affirming the administrative law judge's (ALJ) award of Black Lung benefits to Freeman's former employee, Dick Hudson. Freeman challenges the award on two grounds: (1) that the evidence failed to support the ALJ's finding that Hudson invoked the statutory presumption of being totally disabled by pneumoconiosis as a result of his coal mine employment; (2) that the ALJ erred in rejecting Freeman's rebuttal arguments that Hudson was capable of performing his usual coal mine work, and that Hudson did not, in fact, have pneumoconiosis.
 
 
 2
 Dick Hudson worked as a coal miner at Freeman coal mines for 26 years. He worked as an underground miner performing tasks as a driller, a continuous mine operator, and as a roof bolter. Hudson has been unemployed since his retirement in 1972 at age 64. At an administrative hearing, Hudson testified that for 8 to 10 years before he retired physical exertion made him short-winded. He further testified that but for his breathing difficulties which restricted him from doing his job as a roof bolter he would have continued to work until age 65. In 1981, Hudson filed a claim for benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 et seq. (BLBA), which provides benefits to miners who have become totally disabled due to pneumoconiosis, a "chronic dust disease of the lung and its sequelae, arising out of coal mine employment." Freeman United Coal Co. v. Hunter, 82 F.3d 764, 767 (7th Cir.1996) (quoting 30 U.S.C. § 901(b)). The ALJ merged this claim with earlier claims filed by Hudson prior to April 1, 1980, and as a result, determined that it was governed by the "interim regulations" set forth in 20 C.F.R. § 727. See Mullins Coal Co. v. Director, OWCP, 484 U.S. 135, 137-38 (1987) (noting that interim regulations apply to claims filed between July 1, 1973, and April 1, 1980). The interim regulations set up two evidentiary stages: part (a), the presumption-invocation stage, and part (b), the rebuttal stage. Once a claimant produces evidence to satisfy part (a),[1] the miner is presumed to be totally disabled due to pneumoconiosis. Unless the employer then rebuts the presumption in accordance with part (b),[2] benefits are awarded.
 
 
 3
 The parties submitted several items of medical evidence, including X-rays, results from pulmonary function and blood-gas studies, and physician reports. The three X-rays included (1) a 1980 X-ray read as positive for pneumoconsiosis by Dr. Minetree, a certified radiologist, and negative by Dr. Rosenstein, a radiologist who was also a "B-reader";[3] (2) a 1983 X-ray read as normal by Dr. Lippman, retained by the employer; and (3) a 1984 X-ray read as positive by Dr. Minetree and by a B-reader, and negative by two additional B-readers. In addition, the record contained the results of three pulmonary function studies, also known as ventilation or "vent" studies, which measure forced expiration values at one second intervals (FEV sub1) and maximal voluntary ventilation values (MVV). For someone of Hudson's age and height, a presumption of total disability due to pneumoconiosis arises when vent studies establish the presence of a chronic respiratory or pulmonary disease as demonstrated by FEV 1 values of 2.5 or less and MVV values of 100 or less. See § 727.203(a)(2). Hudson's earliest vent study, conducted in 1980 by Dr. Rao, indicated an FEV sub1 of 1.02 and MVV of 94. However, the FEV 1 value was re-read as 2.10. In any event, the 1980 vent study was considered as "qualifying," meaning that it supported a presumption of pneumoconiosis under § 727.203(a)(2). In 1983, Dr. Lippman conducted a vent study on Hudson, resulting in FEV sub1 values of between 2.1 and 2.85 and an MVV value of 56. Although the MVV value was considerably below the normal value indicated in the regulation, these results were considered as "nonqualifying" based on the FEV% l1 values greater than 2.5. Dr. Lippman further commented that this was a normal study, stating that "[p]ulmonary function tests were performed and revealed normal lung mechanics, lung volumes, and diffusing capacity." sub Finally, in 1986 a third vent study was prepared by Dr. Keller, resulting in another qualifying result as demonstrated by an FEV 1 of 1.26 and an MVV of 49. Dr. Campbell, however, re-interpreted this study and found it was not a good effort by Hudson and thus was not reliable.[4] Finally, the record contained the results from a blood-gas study that failed to indicate the presence of a disabling respiratory or pulmonary impairment.
 
 
 4
 In addition to these clinical tests, the record contains the opinions of several physicians. While Hudson's subjective complaints of respiratory problems were documented as early as 1972 by Dr. Merrill, his first diagnosis of pneumoconiosis was not made until August 22, 1980, by Dr. Rao, who checked the box next to pneumoconiosis on a Department of Labor form. In addition, Dr. Rao noted that Hudson had a history of frequent colds and of wheezing, despite being a lifelong nonsmoker. At the time of the exam, however, Dr. Rao reported that Hudson's lungs were normal to inspection, palpation, and percussion, and that rales, rhonchi, and wheezes were not present. But he further indicated that Hudson suffered from dyspnea[5] for 12 years and that Hudson's pulmonary disability physically restricted him from walking any more than two blocks, or climbing more than one flight of stairs.
 
 
 5
 In 1983 Freeman hired Dr. Lippman to examine Hudson. Dr. Lippman, an instructor of medicine and director of the pulmonary function laboratory at Washington University School of Medicine in St. Louis, reported Hudson's complaints of shortness of breath, inability to hunt, to walk, or to carry anything without experiencing breathing difficulty, and that Hudson was taking a prescription drug for his breathing difficulties. He also reported, however, that Hudson did not complain of chest pain and that, upon examination, Hudson's lungs were "free of wheezes, rales, or ronchi."--Dr. Lippman also indicated that the results from a stress test performed on Hudson were inconsistent with any significant cardiopulmonary disease. Attached to his report were the results from the 1983 vent study which indicated normal FEV1 values and a reduced (below normal) MVV value. In conclusion, Dr. Lippman stated that there was no evidence of pneumoconiosis or any pulmonary impairment.
 
 
 6
 The record also contains a 1986 report from Dr. Keller, who had been Hudson's personal physician for at least 10 years. Dr. Keller diagnosed Hudson with pneumoconiosis, stating that there was "much evidence to prove this problem." He specifically referred to a July 1980 chest X-ray,[6] the 1986 vent study,[7] and the fact that Hudson was a nonsmoker. Indeed, he stated that Hudson had never been a smoker and that coal dust was the only possible cause for his pulmonary problems. He also stated that, on physical examination, Hudson could not walk any distance without becoming increasingly short of breath, and that he could not walk up an incline without severe shortness of breath. He reported "markedly decreased breath sounds" and "mild expiratory wheezes bilaterally." In conclusion, Dr. Keller stated that Hudson was "definitely" disabled due to a "severe chronic lung disease resulting from pneumoconiosis," and that "any further exposure to a similar environment to the coal mine would definitely aggravate, and further progress his already severe disease."
 
 
 7
 The proper standard of review in Black Lung benefits cases is well-established in this circuit:
 
 
 8
 We review the decision of the ALJ, despite the fact that the appeal comes to us from the Benefits Review Board. Although we carefully scrutinize the record and the ALJ's findings, we take care not to reweigh the evidence or to favor our own judgment above the ALJ's. Our task is simply to "determine whether the ALJ's decision is rational, supported by substantial evidence, and consistent with governing law." "Substantial evidence" amounts to more than a scintilla, but not necessarily a preponderance. " 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Once we have examined the ALJ's findings, we look to the Board's decision to confirm that it appropriately reviewed the ALJ's determination and committed no legal error in doing so.
 
 
 9
 Freeman v. Hunter, supra, 82 F.3d at 767 (citations omitted). So we must apply this standard of review to the ALJ's findings which Freeman now challenges, including the ALJ's finding that Hudson invoked the interim presumption under § 727.203(a)(2) of being totally disabled due to pneumoconiosis and that Freeman failed to rebut this presumption either under § 727.203(b)(2) or § 727.203(b)(4).
 
 
 10
 The ALJ found that a preponderance of the evidence demonstrated that Hudson was entitled to the presumption of total disability due to pneumoconiosis under § (a)(2).[8] In making this finding, the ALJ noted that the record contained three pulmonary function tests, including the "qualifying" 1980 test performed by Dr. Rao, the "nonqualifying" 1983 test performed by Dr. Lippman, and the 1986 test that was "qualifying" according to Dr. Keller but later was found "invalid" by Dr. Campbell, who indicated that the variability of the test results showed that Hudson failed to participate in the study with good effort. Upon accepting the invalidation of the 1986 test, the ALJ turned to the remaining 1980 and 1983 tests. Of the two, the judge found that the 1980 test was "the most reliable" and "entitled to the most weight," noting that Dr. Lippman described the 1983 test as "normal" despite an MVV value of only 56--a value which the ALJ noted was "hardly 'normal.' " The BRB affirmed this finding, noting that the ALJ acted within its discretion in according more weight to the 1980 vent study than to the 1983 vent study.[9]
 
 
 11
 The parties agree that the Mullins preponderance of the evidence applies to the § (a)(2) determination and that this requires the ALJ to weigh conflicting evidence. Freeman contends, however, that instead of weighing the 1980 and 1983 vents studies, the ALJ simply "disregarded the [1983] results." It argues that the ALJ erred in attributing less weight to the 1983 test because the reliability of this test was not at issue. Apparently, this is a reference to the fact that, unlike the 1986 test, Hudson's effort in cooperating with Dr. Lippman during the 1983 vent test was not questioned. Furthermore, Freeman contends that the ALJ erred in discounting the 1983 test based on Dr. Lippman's interpretation of the test as "normal" since invocation under § 727.203(a)(2) does not involve review of the doctor's opinion.
 
 
 12
 The respondents argue that the ALJ did not "disregard" the 1983 test. While conceding that the 1983 test was "nonqualifying" (both the FEV sub1 and MVV value must be equal to or less than the values listed in the regulation to be "qualifying," see § 727.203(a)(2)), they contend that the ALJ acted within his discretion in according it less weight based on its markedly abnormal MVV value, 56. sub Indeed, they interpret the ALJ's reasoning as being consistent with the Supreme Court's statement that "[t]he ALJ's task is, of course, to weigh the quality, and not just the quantity, of the evidence, before determining whether the presumption has been invoked," citing Mullins, 484 U.S. at 149 n. 23.
 
 
 13
 Although it seems obvious that the ALJ did not "disregard" the 1983 vent study as suggested by Freeman, the issue remains whether the ALJ's rationale for according less weight to the 1983 results and more weight to the 1980 results was rationale, supported by substantial evidence, and consistent with governing law. See Freeman, 82 F.3d at 767 (citing Consolidated Coal Co. v. OWCP, 54 F.3d 434, 436 (7th Cir.1995)). Such a review does not permit this court to reweigh the two tests or to favor its judgment above the ALJ's. Id. At first glance, Freeman's argument that the ALJ erred in discounting the 1983 vent study based on Dr. Lippman's comment appears sound because the regulations plainly provide that invocation under § (a)(2), unlike § (a)(1), does not require the ALJ to inquire into physician's opinions regarding the presence of pneumoconiosis. But even if the ALJ erred by pointing to Dr. Lippman's comment (notably, Freeman has not supported this argument with any authority, and we have found no cases on point), a closer look at the ALJ's opinion reveals that the ALJ independently decided to give less weight to the 1983 test after comparing the values reported by Dr. Lippman with those in the regulation. The regulations indicate that the presumption of total disability due to pneumoconiosis arises under § (a)(2) when both the FEV1 and MVV values are equal or less than the values indicated in the regulatory chart. By comparing Hudson's 1983 vent study value to the value in the regulatory chart, the ALJ was within his discretion to notice that the 1983 MVV value of 56 was substantially below the normal value of 100 for someone of Hudson's height and age. To accord less weight to Dr. Lippman's vent study based on this factor does not appear to be irrational or unreasonable. Accordingly, we conclude that the ALJ's invocation under § (a)(2) was rational, supported by substantial evidence, and consistent with governing law.
 
 
 14
 In his original decision, the ALJ found that Freeman rebutted the presumption of total disability due to pneumoconiosis under § (b)(2) by demonstrating that Hudson was capable of performing his former job as demonstrated by medical evidence showing he did not suffer from a totally disabling respiratory ailment. The BRB vacated the § (b)(2) rebuttal, however, noting that in Wetherill v. Director, OWCP, 812 F.2d 376 (7th Cir.1987), this court indicated proof only of a miner's nonpulmonary disabling impairment was not sufficient to establish § (b)(2), but rather that an employer must also show that the miner was able to do his usual coal mine work or comparable and gainful work. Because we subsequently rejected this reasoning in Freeman United Coal Mining Co. v. Foster, 30 F.3d 834, 839 (7th Cir.1994) (allowing rebuttal under § (b)(2) where claimant had no pulmonary impairment and miner quit working due to back injury), cert. denied, 115 S.Ct. 1399 (1995), Freeman contends that the original ALJ's decision should stand. But unlike Freeman v. Foster, the company here is not arguing (and cannot because the record would not support such an argument), that it has proved that Hudson's inability to work was caused by some other nonpulmonary disability such as by a back injury or muscle disease. Rather, Freeman argued (in a slightly different but significant manner) that rebuttal under § (b)(2) applied because Hudson's inability to perform his usual job was not due to having a totally disabling respiratory or pulmonary impairment. Thus, Freeman attempted to disprove a totally disabling respiratory or pulmonary impairment rather than prove some other disabling impairment that, prior to Foster, would not have sufficed to prove § (b)(2) rebuttal. In any event, as the respondents correctly note, the remand was proper because the ALJ's original decision was not based on all the medical evidence as required in the regulation.[10] See § 727.203(b) ("In adjudicating a claim under this subpart [the part (b) rebuttal provisions], all relevant medical evidence shall be considered."); see Mullins, 484 U.S. at 150 (noting that ALJ must consider all the relevant medical evidence at same time during the proof process); Wetherill, 812 F.2d at 382. Still, Freeman argues that the ALJ erred when, on remand, it failed to find that Dr. Lippman's opinion sufficiently established § (b)(2) rebuttal.
 
 
 15
 Rebuttal under § (b)(2) may be established when, considering all the evidence, the ALJ finds that the claimant is able to do his usual coal mine work. § 727.203(b)(2). One method of proving this is to show that the claimant is not totally disabled due to a pulmonary impairment related to coal dust exposure. Foster, 30 F.3d at 839. Thus, if a miner has a pulmonary impairment but the evidence shows it is not so severe as to be disabling, or if a miner's inability to work is solely attributable to some other nonpulmonary disability (unrelated to coal dust exposure), then rebuttal under § (b)(2) is proper. See id. Similarly, rebuttal under § (b)(4) is proper when the evidence establishes that the miner does not, or did not, have pneumoconiosis. See § 727.203(b)(4). Although the analyses under these provisions overlaps somewhat, there may be cases where rebuttal is proper under one but not the other. For instance, the presumption of totally disabling pneumoconiosis under § (a)(2) could be rebutted under § (b)(2) by an employer who shows that the miner actually quit working because of a back injury, despite the employer's inability to establish § (b)(4) rebuttal by proving the absence of pneumoconiosis. Because the result under each rebuttal provision coincides in this case, we will discuss them together.
 
 
 16
 Freeman argues that the ALJ erred in finding that the evidence failed to show that Hudson did not suffer from a disabling pulmonary condition precluding him from performing his former job, pursuant to § (b)(2). Similarly, Freeman contends that the ALJ erred in finding no rebuttal under § (b)(4) based on a finding that the evidence failed to show that Hudson did not have pneumoconiosis. Hence, the issue on appeal is whether substantial evidence supports (1) the ALJ's decision that § (b)(2) rebuttal did not apply because Hudson did not suffer from a disabling pulmonary impairment, and (2) the ALJ's decision that § (b)(4) rebuttal did not apply because Hudson did not suffer from pneumoconiosis.
 
 
 17
 Freeman contends that the ALJ improperly resolved the medical evidence in favor of Hudson, arguing that the judge improperly discounted Dr. Lippman's report based on faulty reasoning; that Dr. Rao's opinion was devoid of reasoning concerning the severity of Hudson's condition; and that Dr. Keller's opinion did not support the ALJ's findings because it was not supported by the medical evidence. Freeman also argues that the negative X-ray evidence and the improvement in Hudson's FEV1 value from 1980 to 1983 indicate that Hudson did not suffer from a disabling pulmonary condition or have pneumoconiosis.[11] Finally, Freeman argues that the BRB erred in reviewing the ALJ's decision when it stated that a treating physician's opinion is entitled to more weight.
 
 
 18
 Against these contentions, the respondents argue that the ALJ's findings are supported by substantial evidence. They assert that the ALJ properly discounted Dr. Lippman's opinion due to his questionable interpretation of the 1983 vent study and his failure to provide a nonmining explanation for Hudson's pulmonary limitations and breathing problems which Dr. Lippman did acknowledge. They also note that Dr. Keller's opinion (upon which the ALJ primarily relied) is sufficiently well-reasoned[12] and supported by the 1980 vent study, the significant decrease in Hudson's MVV values indicated in the nonqualifying 1983 vent study, and by Dr. Rao's report. Finally, the respondents point out that this is not a case like Freeman v. Foster, supra, 30 F.3d at 838, where there was no pulmonary impairment and the miner quit working due to a back injury, nor like Old Ben Coal Co. v. Director, OWCP, 62 F.3d 1003, 1009 (7th Cir.1995), where the respiratory impairment might be caused by smoking. In sum, the respondents argue that Freeman is merely asking us to impermissibly engage in reweighing of the evidence.
 
 
 19
 While it is true that we may not reweigh evidence, we must assure ourselves that the ALJ's decision was rationally based and supported by substantial evidence. In making this inquiry, we often recite the following principles: (1) the ALJ may not substitute his or her opinion for that of a physician, see, e.g., Mitchell, 25 F.3d at 508; (2) the ALJ may not ignore medical testimony, absent contrary conflicting testimony, unless the ALJ provides a valid reason for doing so, see Wetherill, 812 F.2d at 382 (setting forth the requirements that the ALJ consider all relevant medical evidence and not disregard the medical conclusions of a qualified physician absent countervailing clinical evidence or a valid legal basis for doing so); Blakely v. Amax Coal Co., 54 F.3d 1313, 1321 (7th Cir.1995) ("The ALJ may, after considering all relevant medical evidence, disregard the medical conclusions of a qualified physician when confronted with countervailing clinical evidence."); (3) the ALJ may not accord greater weight to a physician's testimony based only on his or her status as a treating physician, see, e.g., Consolidated Coal Co. v. OWCP, 54 F.3d 434, 434 (7th Cir.1995) (remanding black lung award where ALJ improperly gave greater weight to physician's opinion based only on his status as the claimant's treating physician); (4) the ALJ may not rely on conclusory opinions devoid of reasoning such as those often written as an accommodation to a patient, see, e.g., Peabody Coal Co. v. Helms, 901 F.2d 571, 573 (7th Cir.1990) (vacating finding of total disability where ALJ's stated reason for giving no weight to a particular physician's opinion had no basis in the record, and where physician's opinion upon which the ALJ relied was "hopelessly ambiguous" concerning the severity of the miner's disability).
 
 
 20
 Freeman's arguments theorize that the ALJ's decision ran afoul of all of these principles. But we do not believe that the record shows that the ALJ substituted his opinion for Dr. Lippman's or that the ALJ improperly discounted Dr. Lippman's opinion. The ALJ noted that Dr. Lippman reported that Hudson's lungs were "normal" despite the abnormally low MVV value in the 1983 vent study. The ALJ also found it significant that Dr. Lippman provided no other explanation for Hudson's respiratory and pulmonary difficulties, after acknowledging that Hudson was a nonsmoker. Freeman has not demonstrated that these reasons for discounting Dr. Lippman's opinion are irrational or unsupported by the record. And although Freeman believes that the ALJ erroneously gave greater weight to Dr. Keller's opinion based only on his status as a treating physician, the record belies this assertion. The ALJ noted that Dr. Keller's opinion was consistent with the 1986 vent study, as well as an X-ray performed in July of 1980. Freeman argues, however, the Dr. Keller's opinion was not sufficiently reasoned to support the ALJ's reliance on it because the 1986 vent study, which Dr. Keller referred to, was later found to be unreliable. The development concerning the validity of the 1986 vent study does not necessarily invalidate Dr. Keller's opinion. "A doctor's opinion cannot be rejected because it was based on tests that were interpreted differently by others." Mitchell, 25 F.3d at 508. But even if the 1986 vent study may not be considered as support for Dr. Keller's opinion, Dr. Keller's opinion may still be sufficiently reasoned to support the ALJ's reliance on it. In Sahara Coal Co. v. Fitts, 39 F.3d 781, 783 (7th Cir.1994), we noted:
 
 
 21
 When a witness relies for his conclusion on facts A, B, and C, and fact A is knocked out, it does not follow that his conclusion must change. It may be that his conclusion would be unchanged as long as two out of the three facts, or even just one of the three facts, were true. If this is plain there is no need to ask him to reconsider in light of the altered premise (not-A in place of A); but if it is not plain, then one must ask him to reconsider.
 
 
 22
 In addition to the 1986 vent study, Dr. Keller noted that his conclusion was based on a July 1980 X-ray and on his physical examination of Hudson. Even if this was the same X-ray (as suggested by Freeman) that was later interpreted by a B-reader as negative for pneumoconiosis,[13] Dr. Keller's opinion is still reasonable based on his physical examination of Hudson (revealing Hudson's impaired mobility due to breathing difficulties) and the fact that he found no other possible cause (besides coal dust exposure) for Hudson's condition. See Poole v. Freeman United Coal Mining Co., 897 F.2d 888, 894 (7th Cir.1990) (noting that "a description of physical limitations in performing routine tasks may be sufficient to allow the ALJ to infer total disability). Moreover, Dr. Keller's opinion is consistent with the 1980 vent study and Dr. Rao's diagnosis of pneumoconiosis. In regard to Dr. Rao's report, Freeman claims it is too conclusory to support the ALJ's findings. As previously noted, Dr. Rao reported Hudson's history of wheezes, that he was a lifelong nonsmoker, that he suffered from difficult or labored respiration for at least 12 years, and that his pulmonary disabilities restricted him from walking any more than two blocks or climbing more than one flight of stairs. Taking into consideration the physical limitations described by Dr. Rao, and by Dr. Keller, relative to the exertional requirements of Hudson's usual coal mine employment, the ALJ could reasonably infer that Hudson was totally disabled within the meaning of the rebuttal provisions at issue here. See Poole, 897 F.2d at 894. For all these reasons, we believe that Freeman failed to establish rebuttal under § (b)(2) or § (b)(4). See Peabody Coal Co. v. Director, OWCP, 778 F.2d 358, 363 (7th Cir.1985) (noting that unless the opinion relied upon by the ALJ so departs from the available information as to offend reason, his decision to credit it may not be questioned).
 
 
 23
 Accordingly, we affirm the judgment awarding Black Lung benefits to Hudson.
 
 
 
 [1]
 Under part (a), a claimant who has worked in a mine for at least 10 years is entitled to the presumption of total disability due to pneumoconiosis if a preponderance of evidence shows that (1) a qualifying X-ray, biopsy, or autopsy indicates the presence of pneumoconiosis, (2) ventilation studies establish the presence of a chronic respiratory or pulmonary disease, (3) blood gas studies demonstrate an impairment in the lung's ability to transfer oxygen to the blood, (4) other medical evidence establishes the presence of a totally disabling respiratory or pulmonary impairment, or (5) in the case of a deceased miner, a survivor's affidavit demonstrates the presence of a totally disabling respiratory or pulmonary impairment. See § 727.203(a)(1)-(5); Mullins, 484 U.S. at 161 n. 35 (holding that part (a) factors must be proved by a preponderance of the evidence)
 
 
 [2]
 Under part (b), an employer may rebut the presumption of total disability due to pneumoconiosis by showing that (1) the miner is performing his usual or comparable work, or (2) the miner is capable of performing his usual or comparable work, or (3) the miner's disability did not arise from coal mine employment, or (4) the miner does not suffer from pneumoconiosis. 20 C.F.R. § 727.203(b)(1)-(4)
 
 
 [3]
 A "B-Reader" is a physician who has demonstrated proficiency in assessing and classifying X-ray evidence of pneumoconiosis by successful completion of an examination conducted by or on behalf of the Department of Health and Human Services. As noted by the ALJ, the opinion of a B-reader is entitled to greater weight based on that physician's additional training in the interpretation of X-rays. (Pet.App. at 6)
 
 
 [4]
 Federal regulations proscribe quality standards that must be met before results from vent studies may be used to establish a presumption pursuant to § 727.203(a)(2). For instance, 20 C.F.R. § 410.430 states that studies should not be performed during or soon after an acute respiratory illness, and that certain procedures must be followed if wheezing is present. Further, it instructs the examiner to include a statement "as to the individual's ability to understand the directions, and cooperate in performing the tests." Id. (emphasis). Based on Dr. Campbell's characterization of the 1986 test results as indicating that Hudson did not fully cooperate, the ALJ refrained from relying on this test. (Pet.App. at 3.)
 
 
 [5]
 "Dyspnea" is the medical term used to describe difficult or labored respiration. Webster's International Dictionary 712 (3d ed. 1986)
 
 
 [6]
 According to Dr. Keller, this X-ray showed that Hudson suffered from emphysema and fibrosis. But the only X-ray from 1980 noted by the ALJ as appearing in the record is the X-ray that was performed in August of 1980, and as previously noted, that X-ray was read as positive for pneumoconiosis by Dr. Minetree, a radiologist, and negative for that disease by a B-reader. The record does not indicate whether Minetree or the B-reader found the August 1980 X-ray positive for emphysema or fibrosis. Thus, it is unclear whether Dr. Keller meant to refer to the August 1980 X-ray or to another X-ray, performed a month earlier, that does not appear in the record
 
 
 [7]
 In regard to Hudson's 1986 MVV value, Dr. Keller found it significant that the value had decreased since the prior vent studies
 
 
 [8]
 Originally, the ALJ found that Hudson invoked the presumption of disability under § (a)(1) based on the presence of a single qualifying X-ray, and under § (a)(2) based on a single qualifying pulmonary function study, namely, the 1980 study conducted by Dr. Rao which resulted in an FEV sub1 value of 1.02 (later reinterpreted as 2.10) and an MVV value of 94. The BRB vacated these findings, however, noting the Supreme Court's announcement in Mullins that a single qualifying test would not necessarily invoke the presumption, and instead that the presumptions must be established by a preponderance of the evidence. (Pet.App. at 2.) sub Hence, on remand the ALJ was required to consider all the vent studies and decide whether by a preponderance the studies established the presumption under § (a)(2)
 
 
 [9]
 In this same order, the BRB vacated the ALJ's additional invocation under § (a)(1) because the ALJ had improperly relied on the "true doubt" rule which the Supreme Court rejected in Director, OWCP v. Greenwich Colliers, 512 U.S. 267 (1994). Because it vacated the § (a)(1) finding, the BRB again remanded the case to the ALJ to consider whether rebuttal could be established under § (b)(4). This remand was necessary because the ALJ's earlier rejection of § (b)(4) rebuttal was based on its understanding that once a presumption is established under § (a)(1), it cannot be rebutted under § (b)(4). See Mullins, 484 U.S. at 150
 
 
 [10]
 In its original decision, the ALJ considered only the opinions of Dr. Merrill, Dr. Rao, and Dr. Lippman. It noted that neither Dr. Merrill's nor Dr. Rao's opinion confirmed that Hudson suffered from disabling pneumoconiosis. It therefore denied benefits, noting that Dr. Lippman's report was inconsistent with a finding of pneumoconiosis. As noted by the respondents, the ALJ specifically failed to consider Dr. Keller's medical report
 
 
 [11]
 Neither the negative X-ray evidence nor the increased FEV sub1 values in the 1983 vent study supports Freeman's arguments. See Mitchell v. OWCP, 25 F.3d 500, 508 n. 13 (7th Cir.1994) (noting that " 'while X-rays demonstrating pneumoconiosis are reliable to prove the existence of the disease, the absence of such evidence in X-rays does not reliably indicate that the miner does not suffer from pneumoconiosis' ") (quoting Chastain v. Freeman United Coal Mining Co., 927 F.2d 969, 970 (7th Cir.1991)). sub See also Mullins, 484 U.S. at 150 n. 26 (noting the general rule that an employer may not prove § (b)(2) rebuttal by pointing to evidence of the sort introduced (and outweighed) during invocation)
 
 
 [12]
 The respondents point to Dr. Keller's documentation of Hudson's physical limitations and clinical symptoms caused by his pulmonary impairment: "On physical examination, Mr. Hudson cannot walk any distance, I would say longer than 80-100 feet without becoming increasingly short of breath. He cannot walk any incline at all without getting severe shortness of breath and having to stop and rest. His breath sounds on physical exam were markedly decreased with mild expiratory wheezes bilaterally." (Resp.Br. at 10) (R. at CX-6.)
 
 
 [13]
 In any event, Freeman cannot rely on the negative X-ray report to rebut the presumption of total disability because the ALJ found that the X-ray evidence was inconclusive regarding the presence (or absence) or pneumoconiosis. See Mitchell, 25 F.3d at 508 n. 13 (noting that negative X-rays do not reliably indicate that a miner does not suffer from pneumoconiosis although a positive X-ray may prove the existence of pneumoconiosis)